[No. 418. Decided April 30, 1892.]

THE STATE OF WASHINGTON, *Respondent*, v. ALBERT FREIDRICH, *Appellant*.

MURDER—NEW INDICTMENT AFTER REVERSAL—EVIDENCE—STENOGRA-PHER'S NOTES—REBUTTAL—INSTRUCTIONS.

The fact that, after the reversal of a judgment of conviction, a new indictment is presented against defendant, which is identical with the one upon which the former trial and conviction were had, with the exception that the christian name of the person killed is changed from "John" to "Julius," affords no ground for a plea in abatement that defendant has been once in jeopardy.

A stenographer's notes of evidence, taken at a former trial, cannot be introduced for the purpose of impeaching the testimony of a

witness on the second trial regarding matters alleged to have been testified to by him at such former trial.

Where one witness has improperly been allowed to testify that in a conversation with the murdered man, the latter said he did not know who shot him, the testimony of another witness, who was present at the conversation, that the deceased, in answer to the inquiry who shot him, mentioned the name of defendant, is admissible as rebuttal, on the ground that it calls for a full conversation of which a part only had been given.

It is not error for a court to refuse to give an instruction defining and explaining circumstantial evidence in scientific legal terms drawn from text writers, when the instruction as given covered every material point in plainer language.

Where the defendant in a trial for murder is a witness, it is proper to refuse an instruction that "in criminal cases, and especially in cases of homicide, the statements made by the defendant are of the utmost and essential importance," as such an instruction would have called the attention of the jury to him and given his testimony more importance than that of other witnesses.

Where the court has charged that the statements made by the injured party hours after the receipt of his injury are incompetent and inadmissible, but that when statements are made by the injured party in the presence or hearing of defendant, it is the acts, words and conduct of the accused, and not the statements of deceased, that are evidence, it is not error for the court to refuse to add thereto, that "if the injured party, prior to his death, is confronted with the defendant and accuse him of having committed the act, and the defendant immediately denies it, the statements of the deceased are to be wholly disregarded."

In a criminal trial, an instruction calling the attention of the jury to the personal appearance and demeanor of the defendant during the trial is improper.

It is proper to refuse to instruct the jury that "if you believe that any witness has sworn falsely in this case in regard to any matter material to the issue, you should distrust all of his evidence," as the jury must believe the testimony to be willfully false if they would wholly disregard it.

An instruction that, if the jury believe a witness has willfully sworn falsely in a material matter, his testimony should be disregarded altogether, is not objectionable with the modification, "except so far as it may be corroborated by other evidence in the case."

On a trial for murder, where the prosecution has merely proved that defendant did the shooting and fled, with the design of escaping,

but fails to show any motive, plan or deliberation, and defendant shows that he and deceased were fast friends and on the best of terms during the day of the shooting, the supreme court is justified, under § 1429, Code Proc., in modifying a judgment of death for murder in the first degree, and ordering an entry of judgment for murder in the second degree.

*Appeal from Superior Court, King County.*

The facts are stated in the opinion.

*Tyler & Tyler,* for appellant.

*John F. Miller,* Prosecuting Attorney, and *James A. Haight,* for The State.

The opinion of the court was delivered by

STILES, J.—This was the second trial of the appellant for the crime of murder. The first trial was reviewed by this court, and is reported in 2 Wash. 358.

The record shows that after the former judgment of conviction was reversed and a new trial granted, and on the 17th day of July, 1891, the grand jury of King county presented a second indictment against the appellant, which was identical in substance with the one sustained by the decision of this court, with the exception that, whereas, the name of the person killed was in the former indictment laid as *John* Scherbring, in the latter it was laid as *Julius* Scherbring. On the 12th day of September, 1891, appellant was arraigned upon the new indictment, and without any other plea or objection entered his plea of not guilty, and the cause was set for trial on September 21st. The plea of not guilty was not, according to the record, at any time thereafter withdrawn. But on September 16th counsel for appellant filed in the cause a lengthy document, the theory of which is not clearly apparent, and which we shall not characterize by any descriptive term. The superior court ruled upon it as a motion to "dismiss the in-

dictment," and denied the motion; also as a demurrer to
the indictment, which it overruled. With the plea of not
guilty remaining in force, it is apparent that all the pro-
ceedings narrated as subsequent to its entry were irregular
and not warranted by the statutes. Code 1881, ch. 85;
Code Proc., §§ 1269–1294. And when we add that no
exception to any ruling of the court appears in this con-
nection, it will be seen that it is only because of the gravity
of the case and the absence of objection on the part of the
respondent that we consider the alleged error. It is con-
ceded by the appellant to be well considered and settled
law that one who has been convicted of an offense, and
who, upon his own motion, in either the trial or the appel-
late court secures a new trial stands as though he had not
been tried at all, and has not been put in jeopardy within
the constitutional prohibitions. It is also conceded that
several indictments may be returned against one defend-
ant before his trial, all covering the same offense, and
that he may be tried upon either of them, the prosecution
making the election. We cannot, therefore, accede to the
proposition laid down by the appellant that "the judg-
ment in this case must be reversed because the defendant
has been once convicted on the same charge and has been
once in jeopardy." The concessions of the appellant
above alluded to, which are correct general rules in the
administration of criminal law, preclude the plea of
former jeopardy in this case; so that the real issue is
whether after an appeal by the defendant, and a decision
sustaining the former indictment, and the granting of
a new trial thereon, the state was then and thereby pre-
cluded from proceeding upon a fresh indictment. Coun-
sel insists that no case has been found where such a
course has been taken and sustained, which seems to be
true; yet it may not be unlawful. He also suggests
that if this practice is sustained there would be
nothing to prevent the prosecution from trying and con-

victing a prisoner for manslaughter and after he had
served his sentence, indicting and trying him for murder
of the same person; or from so re-indicting and trying
him after his acquittal on the first charge. But the logic
of this proposition fails, because in both these supposed
cases actual jeopardy would have been suffered which
would bar the second prosecution. So in this case, if the
conviction of the appellant be now sustained in any
degree, the judgment entered against him in pursuance
thereof will forever be a bar to any further prosecution.
Bishop, Crim. Law, §§ 1056, 1057. Indictments will not
be permitted to be piled up against a defendant for the
purpose of harassing or confusing him, but the discretion
of the court must be appealed to for his protection.
Bishop, Crim. Proc., § 770. But in this case there seems
to have been an honest doubt in the mind of the prose-
cutor whether if the true name of the deceased Scherbring
was Julius and not John a fatal variance would not be
developed. Whether correct or not, the new indictment
stated the true fact, and it is impossible to discern in what
manner the appellant was injured by it. Says the court
in *Commonwealth v. Drew*, 3 Cush. 279:

"It appears to us to be the settled rule of law, that the
pendency of indictment is no good plea in abatement to
another indictment for the same cause. Whenever either
of them—and it is immaterial which—is tried, and a
judgment rendered on it, such judgment will afford a good
plea in bar to the other, either of *autrefois convict* or
*autrefois acquit*. But where it is found that there is some
mistake in an indictment, as a wrong name or addition,
or the like, and the grand jury can be again appealed to,
as there can be no amendment of an indictment by the
court, the proper course is, for the grand jury to return a
new indictment, avoiding the defects of the first. And it
is no good ground of abatement, that the former has not
been actually discontinued, when the latter is returned."

No reason appears why this may not occur as well after

a new trial has been granted by an appellate court as before.

The first exception relied upon relates to the contradiction of the witness Longstaff. This witness testified at the first trial to having seen the accused at a certain place on Madison street, Seattle, on the evening of July 15th, the day after the alleged homicide. At this trial he stated that at the place in question he spoke to appellant and "told him he had a pretty nice ring there," whereupon "he put his hand *that way* under the work bench." On cross examination he was questioned whether he had testified at the former trial to having spoken to appellant about the ring, and he affirmed most positively that he had. Appellant's counsel maintained that he had not so testified, and sought to contradict him in that particular. There was some materiality in the matter, as the question of the identity of the person spoken to was in issue, the appellant having been arrested about noon of the following day, some twenty miles away on the opposite side of the city. The defense, to contradict Longstaff, produced the witness Bowman, who took down the testimony at the former trial in short hand, and furnished the same in long hand for the statement on the first appeal. He identified a duplicate of his long hand notes, and later in the progress of the case counsel proposed to read from the duplicate the former testimony of Longstaff. But the state's objection to the reading was sustained by the court, one of the grounds being the incompetency of the evidence. We do not think appellant's proposition that he should have been allowed to read the long hand notes can be sustained. He was seeking to prove a negative, viz., that Longstaff had not testified on the first trial that he had spoken to appellant about the ring on his finger. Bowman was present and competent to testify as to that. He could have been asked whether Longstaff had testified as he claimed; and if

unable to answer without his notes he could have been permitted to refer to them to refresh his recollection. But independent of him his notes had no standing in the court; *State v. Baldwin*, 36 Kan. 1. Counsel, we think, errs upon this point through his viewing Bowman as an official of the court. He cites *People v. Morine*, 61 Cal. 367, where the reading of reporter's notes was sustained. The only point there considered, however, was whether the oath of an official reporter to the correctness of his notes, at the trial, was equivalent to his certificate required by statute, and the court in effect said that it was. But this was under the California statute which makes reporter's notes when written out and certified *prima facie* a correct statement of testimony; Cal. Code of Civ. Proc., § 273. We have no such basis for the ruling asked.

The next exception relates to the testimony of a witness, Murphy, ex-chief of police. Scherbring was in his charge during the night after he was shot and until he was sent to the hospital the next day. He lay upon a cot vibrating between a drowsy sleep and a more or less wakeful condition, but probably at no time much more than barely sensible of his condition. The defense called Murphy to testify what Scherbring had said to him under these circumstances, on the morning of the 15th, in response to repeated questions as to who had shot him. The state objected strenuously on the ground that no such statements could be admitted as *res gestæ*, and therefore not at all. But the court allowed the witness to proceed, which he did as follows:

"I asked him first the question how this came about, or who done it, and he was loth to tell, and I had to wake him up two or three times; he was drowsy, and I asked him how long it had been done, and he said 'last night.' Says I, 'who done it?' Says he, 'I don't know.' 'Well,' says I, 'tell me,' but he went to sleep. I woke him up and

tried; I talked to him for a while, and says I, 'did you see the doctor?' And he says, 'yes, the doctor says I will be all right.' I tried to talk to him more; and I told him 'the doctor lied, you will die—tell me what you know.' 'Well,' says he, 'I don't know nothing about it.' I stayed with him for quite a while to bring out what I could, and finally I asked who was with him through the night, and he said 'Freidrichs;' says he, 'my best friend was with me.' That was pretty near all I could get out of him; he was drowsy and was falling back every little while, and seemed to be in pain."

The state in cross examining the witness, asked him:

"I will ask you if you heard him when he was asleep there mumbling with his hands, and saying, 'Freidrich, don't! Freidrich, don't!' in his sleep?"

After objection, which was overruled, the witness answered that he did not remember anything particular about that. Counsel criticises the court's action in this matter, but, it seems to us, without just cause. The testimony of Murphy was clearly not competent. It was not offered as part of the *res gestæ*, but as an offset to certain testimony introduced by the state. That testimony consisted of statements made by certain witnesses to the effect that on the day of his arrest (July 16th) appellant, when told of the charge against him strongly denied it, and demanded of the sheriff that he be taken to the hospital where Scherbring was, saying at the same time that Scherbring was his best friend and would exonerate him on sight. Being taken into the presence of the wounded man the latter identified appellant and directly charged him with having been the person who shot him. Appellant immediately exclaimed, "Oh, Scherbring! how do you say such a thing?" and denied having fired the shot or having anything to do with it. The purpose of this testimony was to prove an admission by silence or conduct, and nothing more. It may have had great weight with the jury, and they may have, perhaps,

considered what Scherbring said as though he were testifying to it before them, though in doing so they would have disregarded the clear instructions of the court, who told them that it was the acts, words and conduct of the accused, under the charge made by the injured man, that was to be considered, and not the mere statement of the latter, which was of itself but hearsay and incompetent. Now appellant, in producing Murphy's testimony, proceeded upon the theory that Scherbring's statement and not Freidrich's conduct was in evidence, and attempted to show that at another time and place, and not in Freidrich's presence, Scherbring had said that he did not know who shot him, and impliedly excluded Freidrich from the list of those who might have shot him. We have gone over all this ground to show the situation of the case at the time Murphy was asked by the prosecutor about what Scherbring said in his sleep, because it seemed necessary to illustrate the position taken by the learned judge of the superior court that the state was entitled to inquire fully into what occurred for the purpose of testing the memory of the witness. Whether the court's position was correct or not it does not seem necessary to decide. The mere asking of a question is not objectionable; though in criminal cases it sometimes happens that the asking of an improper question, like the making of an offer of improper testimony, may be such misconduct on the part of the prosecution as to require reversal. But the obnoxious question in this case was answered favorably to the appellant, and it is not claimed that the asking it constituted misconduct on the part of the state. On the merits of the exception, respondent does not contend that what a man says in his sleep can be entertained in a court of justice as proof of any fact, either for or against himself or another. The defense having obtained the testimony of Murphy, a witness, Bogart, who was present with Murphy and Scherbring, was called by the state

and asked for his version of what was said, and he stated
that Murphy told Scherbring he would certainly die, and
that he might as well tell who shot him, whereupon
Scherbring answered the single word "Freidrich." Coun-
sel insists that the court erred in refusing a charge that
Bogart's statement could be considerered only as offered
to impeach Murphy. The court held that it was rebuttal,
calling for a full conversation of which a part only had
been given.    In this we think there was no error except
what grew out of the original error in admitting the tes-
timony at the instance of the defendant, of which he can-
not complain. As to the admission of such testimony, see
*State v. Curtis*, 70 Mo. 594.

The court charged the jury at length, and with such
fairness to the accused that no exception was taken to any
portion of the charge given by him, and no error in giv-
ing the charge is now suggested.    But five exceptions to
refusals to charge are presented.    The first one embraced
a series of propositions, defining and explaining circum-
stantial evidence, in set, scientific legal terms drawn from
text writers, to the giving of which there could have been
no objection, except that it was not couched in the plain
language which ought, if possible, to be employed in a
charge to a jury.    The court in its charge covered every
material point, in better language because plainer En-
glish; and the only ground of complaint is that the defend-
ant had a right to have his propositions of law submitted
to the jury in his own language, if they were correct in
principle and applicable to the case.    *People v. Williams*,
17 Cal. 142, and *State v. Evans*, 33 W. Va. 417, are relied
on to sustain this point. The former case based a reversal
on the fact that the court did not *say* to the jury that his
refusal to give the charge requested was because an
equivalent one had been given before.    This decision
must pre-suppose that the requests to charge were read in

the presence of the jury, a practice which does not prevail in this state. In the latter case the theory of a homicide was self defense, and the defendant proposed a definition of self defense in the exact language used by the supreme court in *State v. Cain*, 20 W. Va. 679. Instead of giving the definition asked the circuit court gave a somewhat similar one, "but weighted down by lengthy qualifications based upon selections from the evidence of particular facts, which are thus given undue prominence while the force of the exact and true statement of the principle which the defendant was endeavoring to get before the jury was dissipated and destroyed." A very different case from that before us, where no objection to, or criticism of, the language of the learned superior judge is made. Our Code of Civil Procedure, § 354, sub. 4, makes it reversible error for the superior court to refuse an instruction which is pertinent and consistent with the law and evidence, provided that the refusal has worked an injury to the party requesting. This is merely the rule without a statute; and under 2 Thompson on Trials, § 2352, and cases cited, it will be found that no error was here committed.

Second request: "In criminal cases, and especially in cases of homicide, the statements made by the defendant are of the utmost and essential importance."

It would have been improper for the court to thus pointedly call attention to the defendant. The proposition is taken from Burrell, Circ. Ev. 187, where it is credited to Starkie on Evidence; but it was made by Starkie when the law did not permit a defendant to be a witness, and could only apply to such of his statements as could be introduced under the general rules of evidence, as, for example, *res gestæ*, or admissions. As the defendant here was a witness, the charge requested would have called the attention of the jury to him, and given his testimony an importance, as compared with that of other witnesses, to which it was not

entitled. The remainder of the exception goes to the re-
fusal to give a paragraph of legal abstraction, valuable to
the philosophical student of the theories of circumstantial
evidence, but not instructive to read to a jury; there was
certainly no error in declining to do so, in view of what
was said to them.

Third request: "The statements made by the injured
party days or hours after the receipt of the injury, are not,
in and of themselves, competent evidence against a per-
son accused of murder. They are hearsay, and wholly
incompetent and inadmissible; but when the statements
are made by the injured party to the defendant, or in his
presence or hearing, and the defendant remained silent
under the accusation, such silence is a tacit admission of
the truth of the accusation. It is the acts, words and con-
duct of the accused that are evidence, and not the state-
ments of the deceased. (And, therefore, if the injured
party prior to his death is confronted with the defendant,
and accuse him of having committed the act, and the de-
fendant immediately denies it, the statements of the de-
ceased are to be wholly disregarded.)"

The court gave the first part of this request, and refused
the portion within brackets. The error by the omission
complained of has no foundation. The court had already
told the jury that the *statement* of the injured party was
incompetent and inadmissible, but that the conduct of the
defendant was a proper subject for their consideration.
The omitted portion would have added nothing to the force
of what had been said. It must be remembered that what-
ever influence the interview between Scherbring and the
defendant had was brought about by the latter himself.
He demanded that he be taken to the hospital, and in-
sisted upon the meeting. He went there to be exoner-
ated, and must be satisfied to have the jury consider what
actually took place.

Fourth request: This request called the attention of the
jury to the personal appearance and demeanor of the

defendant, during the trial. It was based upon the re-
marks of Mr. Burrill (Circ. Ev. 502) on "Demeanor during
Trial." No precedent for such a charge is furnished. The
court's charge is based upon the evidence, which is the
testimony delivered by the witnesses, and of which the
person of the accused is no part. Some impression, favor-
able or unfavorable, may unavoidably reach the jury box
from the appearance and conduct of the defendant in a
criminal trial, but it would be a most dangerous precedent
for the court to comment upon it; and the idea that it
is to be considered at all comes from a time when a pris-
oner was put in a box by himself, without counsel, and
at the mercy of the court, who in "summing up" could
rule the jury as he willed.

Fifth request: "If you believe that any witness has
sworn falsely in this case in regard to any matter material
to the issue, you should distrust all of his evidence; and
if you believe the witness has willfully sworn falsely in a
matter material to the issues in this case, you are war-
ranted in disregarding his testimony altogether."

The first proposition is not the law; the jury must be-
lieve the testimony to have been willfully false. The sec-
ond one the court gave, in substance, with the addition,
"except so far as it may be corroborated by other evidence
in the case." This is a frequent qualification, and is not,
we think, objectionable. In *Brown v. Hannibal, etc., Railroad
Co.*, 66 Mo. 588, which is cited by appellant against the use
of the qualifying phrase, the lower court had said that if
a witness had willfully sworn falsely, all his evidence
might be disregarded *"unless such as to some part"* should be
corroborated, and the supreme court considered that the
language thus used told the jury to give credit to all
the testimony of the perjured witness, if he was found
corroborated as to part. This was a very different thing
from crediting such part of his testimony as was corrobo-

rated, as is the case before us. With the latter proposition the Missouri court found no fault.

We find no error in the record as presented, and have now to pass upon the last objection, viz., that the evidence did not justify the verdict.

For the reason that we shall make a final disposition of this case at this time, we shall go into a more extensive examination of the facts than we did at the hearing of the former appeal. The case of the State showed nothing of the previous relations of the appellant and the deceased Scherbring, but commenced abruptly at a small saloon near the southerly end of Grant street bridge, Seattle, at about sundown of July 14, 1887. The two men arrived there, walking from Seattle, and had two or three glasses of beer, in which they were joined by some other persons. After drinking once or twice, they went further along the bridge and back again, sat down in front of the saloon a few minutes, had more beer, and then left together to return to the city. During all the time they were about the saloon their appearance was friendly, and there was no suggestion that either of them was any the worse for his drinking. No person testified who saw them after leaving the saloon, except those who looked after them from the saloon, and their observation was merely casual. From that on, the state's evidence lost sight of the appellant until the afternoon of July 15th, when three witnesses testified to having seen him on Madison street, in the suburbs of Seattle, and two of them talked with him. He asked for and was given something to eat, and said he had just come from California on the steamer. The next time he appeared was when he was arrested by officers at Slaughter, in the forenoon of the 16th, as he was walking away from Seattle, along the railroad track, having covered some twenty miles since the previous evening, if it was true that he was then on Madison street.

The Grant street bridge was a wooden thoroughfare one and a half or two miles in length, over the tide flats in the south part of Seattle, generally parallel to and not far from the shore. In several places "gang ways" ran out from the shore to the bridge. At a point on the bridge, between the middle and the north end, not much earlier than half past nine o'clock, and perhaps after ten, witnesses who lived along the shore heard two shots fired in quick succession. One witness heard someone cry out, "Murder! Help!" Another: "Oh Lord! I'm shot!" Another: "Be quiet, it will all be over in a minute." It was dark so that a man could not be seen distinctly more than a few feet. The witnesses ran rapidly toward the sounds of the shots and cries, and reached the place whence they appeared to come in two or three minutes. There they found Scherbring leaning over and clinging to the rail of the bridge, with a bullet hole about the size of a large lead pencil in his head just back of the left ear, and blood on his face and clothing. No other person whatever was seen about there until after the wounded man had been taken away. Two days later, on the evening of the 16th, Scherbring died of his wounds, for, although the ball did not penetrate within the cavity of the skull, it so shattered its inner wall that the resulting inflammation caused death. Under the rules admitting *res gestæ*, what witnesses said to him, and what Scherbring said to them when they found him on the bridge was admitted in evidence. He was weak and staggered so that he fell into the arms of the witness who first reached him. He was asked who shot him, but he either could not or would not tell. Just what he did say it was impossible to determine, as each witness related it a little differently. He asked if witnesses thought he was much hurt, and declared that he would soon be all right. As to who had shot him, he said he didn't know; that it was a large man with dark clothes on. One of two

things is absolutely certain at this point.   If appellant fired the shots, Scherbring was entirely unconscious of what he was doing or saying, or he purposely and with wonderful self command sought to conceal the name of his assailant.

As far as the testimony revealed he did not say to any one that Freidrich was the man until the afternoon of the 16th, when they were brought face to face at Providence hospital.   The officers pursued Freidrich solely upon the information that the two men had been last seen together on the bridge.   As he came walking on the railroad track toward Slaughter, on the morning of the 16th, the officer who made the arrest spoke to and entered into conversation with him.   He first said he was going to Puyallup, afterwards that he was going to Tacoma.   He had some friends over there, and walked in preference to taking a train, as he had plenty of time, and liked the scenery.   He said he was looking out for a location to start a shoe shop.   The officer pretended to have been away from Seattle some time, and asked him the news, but he replied that he knew of none.   He seemed anxious to proceed on his way, but yielded to an invitation to stop for dinner, on the promise of company down the road.   The officer told him that he had seen in the morning paper that a murder had been committed in Seattle, but Freidrich had not heard of it.   Afterwards he said: " Yes, the man who was killed was a good friend of mine;" and being led on, he stated that they got into a boat in the morning and had a few bottles of beer with them, and rowed over across the sound or out into the bay, and were out there quite a while, and came back to his shop, and from there they went to the head of the bay to a saloon, where they stayed until along in the evening, when he told his friend Scherbring that he had to go into town to attend a meeting of the Turnverein, and wanted him to go with him; but the latter refused and

remained behind; that he, himself, went on to the meeting, but only got as far as the door, and finding himself late, did not go in, and that somebody passing told him that a man had been shot, but did not say who it was. He was then arrested, and when told what for, threw himself back in his seat, and laughed, and said: "When I see my friend Scherbring that will be all right." He was entirely cool and manifested no concern. He was taken to Seattle on a locomotive, and while thus riding was asked by the sheriff where he had stopped on the night of the 14th, to which he answered: "I slept in my room." Sheriff: "Well, are you in the habit of making up your bed?" Freidrich. "No, I did not make up my bed. Mrs. DeColoski makes up my bed." (Mrs. DeColoski, who was his landlady, testified that Scherbring had slept with him on the night of the 13th, but that neither of them was there on the night of the 14th, and the bed was not disturbed.) Sheriff: "Have you an attorney?" Freidrich: "No, I don't want any attorney. Bring me before my friend Scherbring, and he will say that I never shot him." Being taken to the hospital Freidrich walked straight up to the bed, reached out his hand and said: "Why, Scherbring, my boy, what is the matter?" Scherbring turned over toward the wall, and would not take his hand. The prosecuting attorney was present, and asked Scherbring if he was conscious of what was going on in the room, and he said he was. "Do you know who shot you?" "I do." "Who was it?" "That man there is the man that shot me," said Scherbring, turning over and pointing his finger at Freidrich. Immediately Freidrich exclaimed: "Oh Julius! how can you say such a thing? You know I had nothing to do with it." Scherbring further stated that as they were coming along the bridge he was a few steps in advance of Freidrich, and for a few moments neither of them had spoken. The first thing he knew there was a shot, and he

dropped to the floor and lost consciousness.   When he re-
covered Freidrich had his knee on his breast and a hand
in his pocket, and when he moved Freidrich said:
"Scherbring, my boy, keep quiet; it will all be over in a
moment."   Then another shot was fired, and he did not
remember any more.   Throughout this narration Freidrich
protested that it was not true, and if correct principle is
to control we must lay entirely out of the case all that
Scherbring said.   He was not on oath, though the state
had full opportunity to so qualify him.   His condition
was such that the prosecuting attorney had to inquire of
him if he was conscious at all.   The attending physician
says, concerning the interview:  " He was suffering so bad
that every once in a while I had to ask that the examina-
tion would be stopped for a moment to give him relief,
and I gave him stimulants occasionally to stand this trial
as well as possible with a clear mind; and after it was
over Scherbring lost his strength very quick, and inside
of a couple of hours he died, after suffering very bad from
inflammation of the brain and from a very severe head-
ache."   Who knows, in consideration of his continual
denials throughout more than thirty-six hours that he knew
who shot him, and of the frequent pressure brought upon
him to say who did it, and to say that Freidrich did it,
but that in his last moments, excited by stimulants and
consumed by the fever in his brain, he may have declared
what never happened.   Besides which, as the court
charged the jury, what Scherbring said was not in evi-
dence as a statement of facts at all, but only to show the
conduct of the accused man in the face of the charge.

   Freidrich in his defense showed that he and Scherbring
had been fast friends for two years; that they had spent the
day together because Scherbring was going away, Freidrich
closing his shoe shop for that purpose; that they took
supper together; that he did propose attending a singing

society's meeting just before they started away from
Seattle, after supper, and after taking a glass of beer with
a friend; and that on the 12th he had changed forty
dollars in silver for gold, which he had given to Scher-
bring, and which he claimed was a loan to Scherbring of
that amount.   To account for his sudden departure from
Seattle he claimed to have met a woman on the street,
after he had left Scherbring on the bridge and passed by
the Turnverein hall, and that she persuaded him to pass the
night with her at her room.   In the morning he got his
breakfast at a restaurant—not his regular boarding place
—went to his shop for a few minutes, and then, not feel-
ing like work that day, started off south along the railroad
intending to get orders for boots from loggers who were his
customers, a thing he had never done before.   He took
several orders during the day, and at night stopped by a
log fire which he found at the road side.   The next morn-
ing he walked to Kent, where he breakfasted and saw a
Seattle paper in which he noticed a headline about the
shooting of someone, but he did not read the account, and
did not know who was shot, until told by the officer at
Slaughter.   In none of these matters was he corroborated
though he claimed that a memorandum book which was
taken from him by the sheriff contained the orders he
had taken for boots.   From the evidence thus produced
to them we think the jury were warranted in finding that
Freidrich fired the shot which resulted in Scherbring's
death, and had there been any suggestion of motive, plan
or deliberation in the case we might, in deference to the
admitted province of the jury, be constrained to sustain its
verdict as rendered.   But the law commits to this court
the power to affirm, reverse or modify any judgment ap-
pealed from, and to direct the proper judgment to be
entered.   Code Proc. § 1429.   And in thus committing a

power, it also imposes the duty to exercise it conscientiously as the facts may appear.

In this case, when we have said that it is proven beyond a reasonable doubt that Freidrich did the shooting and fled with a design of escaping from his guilty knowledge that he had committed a crime, all is said that can be said of the state's case as revealed by the evidence. It is a case singularly without the proof of extrinsic circumstances tending to show what could have been the inducement in his mind to shoot down the man whom he called, and who called him, his best friend. Going beyond the pale of the legitimate evidence in the case even and taking Scherbring's declaration that he felt a hand in his pocket, yet there is not a word to show that he was robbed, or lost any money, papers or other valuables. Then again, Scherbring's mysterious reticence and unwillingness to say that Freidrich had shot him, when if the state's theory be accepted it was a case of merciless assassination, makes it difficult of belief that such was really the crime. The feeling is irresistible that after two trials of the appellant the whole truth of the case has not been made to appear. There may have been a quarrel, with no one knows what attendant circumstances of aggression or provocation upon one side or the other. The homicide as proven stands as an unlawful killing with a deadly weapon, with no circumstances proven by the state or the defense to qualify the act. From the character of the weapon malice is implied and the common law crime of murder is complete; 2 Thompson on Trials, § 2531. But the measure of murder in the first degree is not filled up. 1 Wharton, Crim. Law, § 392, says:

"Wherever the killing is with a deadly weapon, and there is evidence *aliunde* showing that this was intentionally, deliberately and unjustifiably used, then the inference, as we have just seen, is that of an intent to take life, a .d

the case is murder in the first degree. The burden, however, of proving this is on the prosecution. Stripping the case of these incidents, however, and supposing that simply a malicious killing be proved, then the inference is of murder in the second degree."

We have the crime of murder in two degrees by statute, as have most of the states, and Wharton's comments are addressed to these statutes. See cases cited in 1 Wharton, Crim. Law, § 392, and especially *O'Mara v. Commonwealth*, 75 Pa. St. 424; *State v. Wieners*, 66 Mo. 13, 25; *State v. Curtis*, 70 Mo. 594; *State v. Robinson*, 73 Mo. 306. In *McAllister v. Territory*, 1 Wash. T. 360, the court said:

"The burden is on the territory to make out every material allegation in the indictment beyond all reasonable doubt. . . . And we are satisfied that so far as the facts attending the killing are concerned—at least so far as those facts are included in the *res gestæ*, that the burden of proof never shifts."

From these authorities and hundreds of others that might be cited, it is clear that to authorize a conviction of murder in the first degree the jury must have before them, in the case, whether produced by the state or the defense, facts which put it beyond a reasonable doubt that the murder was committed "purposely and of deliberate and premeditated malice, unless done in the perpetration or attempt to perpetrate rape, arson, robbery or burglary, or by administering poison or causing the same to be done." Of such facts, as we view the evidence for the second time, and after many perusals, we find nothing. The distinction made between murder of the first and second degrees is a fine one, and it is not to be wondered at that juries sometimes fail to appreciate it; but the law makes it, and the law is master of us all.

The conclusion of the court is, that the judgment of death rendered in the superior court be set aside and vacated, but that the verdict of the jury stand, and that the

cause be remanded to the superior court of King county, with instructions to enter a new judgment of murder in the second degree against the appellant, and proceed thereon in accordance with law.

ANDERS, C. J., and DUNBAR, J., concur.

HOYT, J. (*dissenting*).—I am unable to agree with the conclusions of the majority in this case. I think that reversible error was committed by the lower court in its rulings during the examination of the witnesses Murphy and Bogart. During the examination of the former the prosecuting attorney asked the following question: "I will ask you if you heard him (referring to Scherbring) while he was asleep there, fumbleng with his hands and saying, 'Freidrich, don't!' in his sleep?" The court overruled the objection of defendant's counsel, and allowed this question to be answered. In my opinion such question was clearly incompetent, and the objection of the defendant's counsel should have been promptly sustained. And I understand that the majority of the court so holds, but they refuse to reverse the case on that ground for the reason that it does not appear that the answer elicited by such question was prejudicial to the defendant. I think it was. If the witness had answered the question directly in the negative, the error would probably have been without prejudice, but such was not the case. The answer of the witness was that "he did not remember particularly about that," and therefrom the jury might have been led to believe that there was something of that kind said by Scherbring in his sleep, but that just exactly what it was, and whether it was exactly in the language of the question or not, had passed from the memory of the witness. If the jury did draw such a conclusion from said question and the answer thereto, it might have materially influenced their verdict. The exclamations of Scherbring when asleep

15—4 WASH.

as to who shot him, though clearly incompetent, and without weight from a legal standpoint, might well have had a potent influence upon the minds of the jury     The ruling of the court being erroneous, it will be presumed that it was prejudicial unless the contrary plainly appears, and to my mind not only does such contrary fail to appear, but such facts do appear as show that such error was probably prejudicial.  If I were in doubt about this error being prejudicial from an examination of the testimony of the witness Murphy alone, I should no longer be in doubt when I examined such testimony, and the action of the court in relation thereto, in the light of the testimony of the witness Bogart, who took the stand to give rebutting testimony against the case made by the defense.  The most of his testimony was taken against the objections of the defendant, and was of such a nature that it tended strongly to sustain the theory of the prosecution, as evidenced by the question above quoted put to witness Murphy, that Scherbring did in fact, while asleep, make substantially the statements indicated by said question, and that the reply of the witness Murphy to said question should have been an affirmative one, and that his statement that he "did not remember particularly about that" was an evasion on his part.  I am, therefore, constrained to hold that the judgment and sentence should be reversed and a new trial ordered.

Scott, J.—I dissent. I think the judgment should have been affirmed.

### ON PETITION FOR REHEARING.

Stiles, J.—Counsel for appellant, with much heat, and language grossly discourteous, calls the attention of this court to the fact that in deciding the appeal nothing was said in regard to their exception numbered six.  This exception was directed to the refusal of the superior court to charge the jury in the following language:

"Having possessed yourselves of all the counter hypothesis (except the affirmative one of guilt) which the most diligent inquiry and reflection can afford, the next step on the part of the jury, and the most important one in the whole trial, is to dispose of them satisfactorily; it being the invariable rule that they must all be excluded from the case before the affirmatory hypothesis, however otherwise clear, can be safely adopted. If the evidence leaves it indifferent which of two or more hypotheses are true, it can never amount to proof of the principal facts sought."

The substance of the charge requested was that the guilt of the prisoner on trial could not be found by the jury so long as there was any reasonable hypothesis of his innocence deducible from the evidence in the case. Counsel complains that the refusal to give this instruction was a vital injury to the cause of the appellant because the principal defense urged at the trial was that the deceased Scherbring had committed suicide; that the main argument of counsel to the jury was based upon that theory, and that the refusal of the court to charge as requested left the jury without proper instruction under which they could consider the theory of suicide. Now, after twice examining the record in this case we are unable to find any fact in the case which could justify an argument to the jury that Scherbring did commit suicide, and, therefore, if such was the purpose of the request the court below committed no reversible error in refusing to give the charge. But the court did charge the jury at least twice to the very substance of the matter requested. It used this language:

"The jury are instructed as a matter of law that where a conviction for a criminal offense is sought upon circumstantial evidence alone, the state must not only show by a preponderance of evidence that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis with the innocence of the accused,

and incapable of explanation upon any reasonable hypothesis other than the guilt of the accused. That to authorize a conviction upon circumstantial evidence alone the circumstances must not only be in harmony with the guilt of the accused, but they must be of such a character that they cannot reasonably be true in the ordinary nature of things and the defendant be innocent."

And again:

"The great duty of the jury in cases of circumstantial evidence is to possess themselves of all the negative or counter hypotheses of which the case will reasonably admit. It is the duty of the jury to inquire with the most scrupulous attention what other hypotheses, besides that of guilt, there may be which agree wholly or partially with the facts in evidence. Those which agree even partially with the circumstances in proof are not unworthy of your examination, because they lead to a more minute examination of those facts with which at first they might appear inconsistent."

And again:

"The presumptions of law independent of the evidence are in favor of innocence. This presumption of evidence remains with him until his guilt is established beyond a reasonable doubt."

We therefore consider the alleged error, if error it was, to have been wholly harmless, and as furnishing no proper justification for a new trial.

That this court in its decision failed to mention exception six was due entirely to an oversight, and furnished no ground, even if it had been intentional, for the unlawyerlike language of this petition, which is denied.

ANDERS, C. J., and DUNBAR and SCOTT, JJ., concur.