*Ex parte* BAILEY.

No. 42.   Opinion Filed March 18, 1908.

(94 Pac. 553.)

CRIMINAL LAW—Venue—No Prosecution before Statehood. An indictment for the crime of murder returned after the admission of the state into the Union for an offense committed under the territory of Oklahoma, where no prosecution whatever had been begun before said date, is cognizable in the district court of the state in the county in which the offense was committed.

(Syllabus by the Court.)

Application by Annie Bailey for writ of *habeas corpus.* Writ denied.

On the 16th day of January, 1908, the relator herein was apprehended by G. W. Garrison, sheriff of Oklahoma county, upon a bench warrant issued by virtue of an indictment returned against her on the same date by the grand jury of Oklahoma county, state of Oklahoma, charging that on the 27th day of August, A. D. 1907, the said relator, Annie Bailey, and Judge Peters, did then and there unlawfully, purposely, willfully, feloniously, and with malice aforethought, and without authority of law, and with a premeditated design then existing in the minds of the said defendants, and each of them, to effect the death of one Lillian Ray, with certain drugs and deadly poisons, the kind and character of said poisons being unknown to the grand jury, then and there given and administered by the said defendants, Annie Bailey and Judge Peters, to the said Lillian Ray, make an assault upon the said Lillian Ray, with the unlawful and felonious intent on the part of the said defendants, and each of them, then and there to take the life of her, the said Lillian Ray, and they, the said defendants, Annie Bailey and Judge Peters, did then and there, by administering said poisons aforesaid, unlawfully, purposely, willfully, knowingly, and feloniously poisoned her, the said Lillian

Ray, from the effects of said poisons she, the said Lillian Ray, did languish, and, languishing, did then and there die, on the 27th day of August, 1907,, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the then territory of Oklahoma, now state of Oklahoma. The venue was also alleged to have been in said county.

On the 2d day of January, 1908, the relator filed in this court her petition for writ of *habeas corpus,* alleging that she was unlawfully restrained by said sheriff of her liberty; further alleging that the offense for which she stood indicted was committed, if at all, on the 27th day of August, 1907, in Oklahoma county, territory of Oklahoma; that no affidavit, information, indictment, warrant, or process of any character whatsoever had been filed or issued against her or any other person charging her or them with the commission of such offense prior to the returning into said district court of said Oklahoma county said indictment; that no rights, actions, suits, proceedings, contracts, or claims existed or were pending up to the time of the returning into court of said indictment whereby or whereunder this said defendant was or could of right be charged with said offense; further alleging that the government of the United States of America had not given its consent to the state of Oklahoma or any consent whereby or whereunder she could be indicted or prosecuted by and under the authority of the state of Oklahoma for the said act, if committed, and, further, that the said state of Oklahoma had not consented to receive and had not accepted or assumed the jurisdiction or right to so prosecute her for such acts as alleged in said indictment, the same being committed under the jurisdiction of the laws of the United States and of the territory of Oklahoma, and, further, that the grand jury of said county, state, and district had no jurisdiction to prosecute said action nor to investigate the said acts or return and present an indictment therefor.

A writ of *habeas corpus* was properly issued on said petition on the 22d day of January, A. D. 1908, and made returnable on the 25th day of said month, and service on said writ being acknowl-

edged and accepted by the said G. W. Garrison as sheriff of said county on the 23d day of January, 1908, and the said sheriff made return showing that he held said relator in his custody as such sheriff by virtue of a bench warrant issued on said indictment hereinbefore referred to and detained her in the jail of said county under a commitment issued by said court. The relator demurred to said return.

*H. L. Bolen* and *Fulton, Jenkins & Spencer,* for relator.
*Charles West, Atty. Gen.,* and *W. C. Reeves,* for respondent.

WILLIAMS, C. J. (after stating the facts as above). We have decided at this term of court in the case of *Higgins v. Brown,* reported in this volume, 94 Pac. 703, that section 20 of the enabling act (34 Stat. pt. 1, p. 277, c. 3325), as amended March 4, 1907 (34 Stat. p. 287, c. 2911), having been concurred in by virtue of the provisions contained in sections 27 and 28 of the Schedule of the Constitution, vested jurisdiction of all criminal cases, not of a federal character, pending at the time of the admission of the state into the Union in the territorial courts of Oklahoma and in the United States courts in the Indian Territory, in the state courts of Oklahoma. Now, the question is presented as to whether or not a prosecution for a criminal offense committed in that part of the state formerly known as Oklahoma Territory prior to the admission of the state into the Union, where no prosecution whatever had been begun thereon, not even a complaint or information having been filed against the accused prior to said date, can be instituted in the state courts afterwards, and prosecuted to a final judgment.

Section 1 of the Schedule of the Constitution provides that "no existing *rights, actions,* suits, proceedings, contracts, or claims shall be *affected by the change in the forms of government, but all shall continue as if no change in the forms of government had taken place."* Section 2 of the Schedule, *supra,* further provides "that all laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repug-

nant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law." As was stated in the case of *Higgins v. Brown, supra,* into every Constitution of the states admitted into the Union since 1791 similar provisions to those of sections 1 and 2 of the Schedule, *supra,* have been incorporated without any concurrence of the federal government, except by implication by acts of Congress, there being no prior enabling act, admitting such state or states into the Union, or by express or reasonable implication in the enabling act, offenses, not of a federal character, committed under the territorial government heretofore have been originally instituted after the admission of the state into the Union, and prosecuted to final determination in the state courts.

The states of Nevada, Colorado, Montana, North Dakota, South Dakota, Washington, and Utah were admitted under enabling acts similar to that of Oklahoma, and wherein no express provision was made for nonpending cases; but in their respective Constitutions practically the same language as that in the Contitution of this state is used for the continuance of rights, actions, and prosecutions just as if there had been no change in the form of government from a territory to a state. Sections 1 and 2 of the Schedule of the Constitution of Washington are almost identically, word for word, the same as sections 1 and 2 of the Schedule of the Constitution of Oklahoma. In the former state offenses not of a federal character committed prior to the admission of the state first instituted after such time were prosecuted to final determination in the state courts as successors of the territorial courts. *State v. Stowe,* 3 Wash. St. 206, 28 Pac. 337, 14 L. R. A. 609; *Lybarger v. State,* 2 Wash. St. 553, 27 Pac. 449, 1029; *State v. Freidrich,* 4 Wash. 206, 29 Pac. 1055, 30 Pac. 328, 31 Pac. 332; *Freidrich v. Territory,* 2 Wash. St. 358, 26 Pac. 976; *Ex parte Freidrich,* 149 U. S. 79, 13 Sup. Ct. 793, 37 L. Ed. 653; *Way v. Woolery,* 6 Wash. 158, 32 Pac. 1082; *Foster v. Territory,* 1 Wash. St. 412, 25 Pac. 459. States with similar enabling acts and

substantially like provisions in their Constitutions have prosecuted such offenses to final determination in their judicial tribunals. *Wilson v. People*, 3 Colo. 325; *Packer v. People*, 8 Colo. 362, 8 Pac. 564; *State v. Carrington*, 15 Utah, 483, 50 Pac. 526; *Higgins v. Brown et al., supra*. The word "right" is defined in Webster's International Dictionary as "that which one has a legal or social claim to do or to exact; legal power; authority, as a sheriff has a right to arrest a criminal; that which justly belongs to one; that which one has a claim to possess or own; the interest or share which any one has in a piece of property; title; claim; interest; ownership." The same authority defines "action" as "a suit or process by which a demand is made of a right in a court of justice; in a broad sense, a judicial proceeding for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense; a right of action, as the law gives an 'action' for every claim."

It will be observed that the Supreme Court of the United States in *Benner v. Porter*, 9 How. (U. S.) 247, 13 L. Ed. 119, stresses the fact that the acts of Congress in the several instances of the admission of a state provide for the transfer of the federal causes to the district court, as in the case of Florida, nothing being said at the time in respect to those belonging to state authority, and the court added that such an omission "may very well imply an assent to the transfer of them by the state to the appropriate tribunal"—and adding that "even the omission on the part of Congress to interfere at all in the matter may be subject to a like implication; and a subsequent assent would doubtless operate upon past acts of transfer by the state authority." Mr. Justice Nelson, speaking for the court, says:

"We have said that the assent of Congress was essential to the authorized transfer of the records of the territorial courts, in suits pending at the time of the change of government, to the custody of state tribunals. It is proper to add, to avoid misconstruction, that we do not mean thereby to imply or express any opinion on the question whether or not, without such assent, the state judicatures would acquire such jurisdiction. That is altogether

a different question. And, besides, the acts of Congress that have been passed in several instances, on the admission of a state, providing for the tranfer of federal causes to the district court, as in the case of the admission of Florida, already referred to, and saying nothing at the time in respect to those belonging to state authority, may very well imply an assent to the transfer of them by the state to the appropriate tribunal. Even the omission on the part of Congress to interfere at all in the matter may be subject to a like implication; and a subsequent assent would, doubtless, operate upon past acts of transfer by the state authority."

*In Re Haslings v. Johnson,* 2 Nev. 190, the court, in referring to the foregoing excerpt from the case of *Benner v. Porter, supra,* said:

"Now, the Constitution of Nevada provides for the transfer of all pending cases from the territorial to the state courts. Congress receives the state into the Union, and admits her representatives under said Constitution without objection. Congress makes no provision for these pending causes, nor any provision for the records of the late territorial courts. Here it appears to us is such tacit assent to the action of the state authorities as the court seems to intimate would be sufficient. It is true the records of the late territorial courts belong to the general government. Congress has the power to do what it pleases with them. It might order them to be removed to Washington City. This might create trouble and inconvenience; but we do not think it affects the question of power. The state may, as long as the records of the territorial courts are within her territory and control, use those records as the foundation of civil proceedings to determine the rights of the citizens in its own courts. If Congress should remove these records or restrain their use by the state courts, some law to substitute copies, or some other remedial statute, would have to be passed by the state courts."

*In Re Inerarity, Adm'r v. Curtis and Griswold, Trustees,* 4 Fla. 183, the court says:

"There is, we think, much force in this view of the question as to causes pending of which the courts of the United States have not exclusive jurisdiction, or cannot, under the Constitution and laws of the United States, take jurisdiction at all; and where, as in the case of Florida, the act of February 22, 1847 (9 Stat. p. 28, c. 17), provides for the transfer of the records and proceed-

ings of certain classes of cases, saying nothing about other classes of which the state courts could take jurisdiction, the inference is irresistible that Congress intended that the state authorities should assume jurisdiction over the latter, or if they had already assumed it, the omission may well be considered as a tacit acquiescence in, and a ratification of, the authority thus claimed and exercised, and in view of the difficulties and confusion which would otherwise arise, in case of a hasty or improvident assumption of authority over the subject by the new state, we should be so inclined to consider the question. Concurring as we do in the opinion expressed by the Supreme Court of the United States in the cases referred to, we feel no hesitation in declaring that the courts of the territory of Florida were courts of the United States, and the records of said courts the records of that government; that the state authorities had no just right to assume the exercise of any authority of jurisdiction over them, except so far as the government of the United States, by express authority or just implication, shall accord the power to do so. So far as Congress, by the act of February 22, 1847, claimed to exercise jurisdiction over certain classes of records and pending causes, it is in our opinion the exercises of a rightful power, and the courts to which the jurisdiction and authority over them is granted are entitled to the custody; and, so far as Congress has not claimed these records, it may be considered as the sanction of the general government to the exercise of jurisdiction by the state authorities over the subject."

*In Re Carter v. Bennett,* 4 Fla. 331, the court says:

"We have shown that, so far as the state Legislature was competent to give it, the circuit court had full authority to hear and determine this case. Had it the sanction of Congress, which we have admitted was necessary to the legal transfer of the records and proceedings therein? The act of Congress of February 22, 1847, was designated to transfer to the United States District Court organized in Florida all such records of the late territorial courts as belonged appropriately to that court. A careful specific enumeration was made of all the classes of cases so as to be transferred as we have already mentioned. It was made the duty of the district judge to take the necessary steps to get possession of these specific records from the clerks of the old courts, or persons or officers having them in their possession, these expressions, 'other officers or persons,' pointing obviously to the clerks of the

state courts, who had in fact succeeded to the custody of the papers. This precise enumeration of cases to be transferred from the state courts leads irresistibly to the inference that Congress acquiesced in the retention by the state courts of all the other cases and the papers belonging to them. The act of the Legislature providing for the transfer of all these cases not thus enumerated had been passed more than a year and a half, and the state courts, under authority of that law, had possessed themselves of them, and had been adjudicating them for nearly the same period. It is impossible to avoid the conclusion that this act of the Legislature and the action of the courts under it received the sanction of Congress in the act of 1847, so far as they were not in conflict with that act. Besides this, Florida has followed many an elder sister into the Union, and the same provisions had been repeatedly made for the transfer of federal causes to the district courts, accompanied by long acquiescence in the assumption by the courts of the new states of the jurisdiction over causes not federal. The clearness and force of this inferential sanction of Congress is fully recognized both by the Supreme Court of the United States and by the Supreme Court of this state. * * *Even the omission on the part of Congress to interfere at all in the matter may be subject to a like implication, and a subsequent assent would doubtless operate upon past acts of transfer by the state authority."

Section 4 of the enabling act, as approved June 16, 1906, (Stat. at Large U. S. 1905-06, pt. 1, p. 271, c. 3335), provides as follows:

"And if the Constitution and government of said proposed state are republican in form, and if the provisions of this act have been complied with in the formation thereof, it shall be the duty of the President of the United States, within twenty days from the receipt of the certificate of the results of said election and the statement of the votes cast thereon and a copy of said Constitution, articles, propositions and ordinances, to issue his proclamation announcing the result of said election; and thereupon the proposed state of Oklahoma shall be deemed admitted by Congress into the Union, under and by virtue of this act, on an equal footing with the original states."

The only limitation is that the Constitution and state government shall be "republican in form" and comply with the provisions of said act. All other provisions which the constitutional con-

vention had the power to insert by reasonable implication are permitted and concurred in, the act of the President consummating the same.

We conclude that the district court of Oklahoma county has jurisdiction of this offense and the power to prosecute it to final determination. The relator is remanded to the custody of the repondent.

Writ of *habeas corpus* is denied.

All the Justices concur.