[No. 7211.  Department One.  September 20, 1910.]

THE STATE OF WASHINGTON, *Respondent*, v. N. H. LILLIE,
*Appellant.*[1]

ASSAULT AND BATTERY—DEADLY WEAPON—EVIDENCE—SUFFICIENCY.
The evidence is insufficient to sustain a conviction for "assault with
a hammer," where the prosecuting witness had the hammer when
he was knocked down and stunned by the first blow, none of the
witnesses for the state could testify that he was struck by the ham-
mer, one testifying that he was knocked down by a blow with the
fist, and defendant's testimony that he struck with his fist was cor-
roborated by the circumstances.

CRIMINAL  LAW — APPEAL—DECISION—REMAND—INDICTMENT—OF-
FENSES INCLUDED IN CHARGE.  Upon reversal of a conviction for as-
sault with a deadly weapon, for insufficiency of the evidence as to
the higher offense, the evidence establishing assault only, the case
will be remanded for sentence for simple assault, as that is em-
braced within the offense charged.

Appeal from a judgment of the superior court for Yakima
county, Rigg, J., entered September 7, 1906, upon a trial
and conviction of assault.  Reversed.

*Henry J. Snively,* for appellant.

*Henry H. Wende,* for respondent.

GOSE, J.—The appellant was tried, convicted, and sen-
tenced to imprisonment in the penitentiary, upon an informa-
tion charging him with having made an assault upon the per-
son of one L. M. Hilton with a deadly weapon with the intent
to inflict a bodily injury, and has appealed from a judgment
entered upon the verdict of the jury.  The charging part of
the information is as follows:

"He, the said Nevada H. Lillie, on or about the 25th day
of April, 1906, A. D., in the county of Yakima, state of
Washington, then and there being, did then and there wil-
fully, unlawfully and feloniously make an assault in and upon
the person of one L. M. Hilton with a deadly weapon, to wit,

[1]Reported in 110 Pac. 801.

a hammer, which he then and there had and held in his hand, with the intent then and there to inflict upon the person of the said L. M. Hilton a bodily injury, no considerable provocation appearing therefor, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Washington."

At the close of the state's case, the appellant challenged the sufficiency of the state's testimony and moved for a dismissal of the case. He also urges here that there is not sufficient evidence to support the verdict of the jury, and that there is no substantial evidence tending to show that an assault was made with a hammer. We think the latter contention must be sustained. It is admitted that Hilton had the hammer when the altercation began. Hilton testified that the appellant first struck him on the side of the head "in the jaw," "with something, I do not know what;" that the blow "addled" and "stunned" him; that he was rendered "unconscious for some time;" that he is not conscious of having been struck more than one blow. He further states that, when he received this blow, he had the hammer in his hand; that "I know positively that he did not hit me with that hammer." This statement has reference to the first blow. Hilton has no further recollection of the altercation.

The state called one Arthur Harper, who bore testimony as follows: That Hilton was lying down when he first saw him; that he could only see his head and shoulders; that he could see all of appellant's body and his right arm as he was kneeling by Hilton; that when he first observed the appellant, he had a hammer "in his right hand, I think." Later he said: "I think he (meaning appellant) had the hammer when I first saw him, but I don't remember." To the inquiry, "What did he do with it?" meaning the hammer, he answered:

"I do not know. I think he struck Mr. Hilton with the hammer, but I would not be willing to swear that he did strike him. . . . He struck the man while I was around there, but whether he had the hammer in his hand when he struck the man I do not know. . . . He struck short blows when he

struck. Whether he had the hammer in his hand I do not know. . . . I thought at that time he did strike him with the hammer. There had been people talking to me there then in Granger every day, coming around and saying he struck him with the hammer, and they were all talking about it, and I thought at that time he did strike him with the hammer, but I was excited and scared and, as I said, I would not be willing to swear that he did strike him or that he did not strike him."

Russell Chamberlain, a boy ten years of age, was introduced by the state and testified, that the appellant advanced toward Hilton, "then he doubled up his fist and knocked Mr. Hilton down;" that he then saw the appellant's elbow "every time he hit him, go up;" that as the appellant walked away he heard Hilton exclaim, "Oh, dear me," to which the appellant replied: "I will learn you to steal a wrench from me." He further stated that he did not see the appellant strike with the hammer. No other witness testified to the assault.

Dr. Dempster, the attending physician, speaking to Hilton's wounds, said:

"Well, he had an open wound over the right eye, probably about two and one-half to three inches in length, following the bony portion of the upper wall of the eye in a sort of a half circle. That is one wound. His cheek was swollen up very badly, he was bleeding at the nose and he had a wound on his upper lip in his moustache. . . Between the cheek bone and the bone here in front of the ear there is a bone, probably the size of a lead pencil and it is flat. It is not round and it is not very thick. It connects the cheek bone with this ear here. This was broken."

The doctor also stated, that Hilton was confined to his bed for three or four days; that the wounds were made with a blunt instrument; that he could not state the nature of the instrument that produced the wounds. In addition to this testimony, it is conceded that, as the appellant walked away from Hilton, he was carrying Hilton's hammer. Harper said that he had it in his right hand, whilst the boy and one Qualls asserted that it was in his left hand. There was blood

on the handle of the hammer. One witness stated that there was some "blood" on the flat of the hammer. It is agreed that, after the assault, the appellant's hand was bleeding freely. The state's witnesses differed as to whether it was his right or left hand. Just after the assault, Hilton's face was bleeding. The appellant testified that he did not strike with the hammer. This statement is corroborated by the witness Moore. The appellant further stated that Hilton made an assault on him, and that he fought with his fists in self-defense.

However, in passing upon the sufficiency of the evidence to support the verdict, we will disregard the evidence of the appellant and accept the state's evidence as true. It is clearly insufficient to support the verdict as to the higher offense. As we have seen, no witness stated that Hilton was struck with the hammer. There is nothing but inference to support the verdict as to the higher offense charged, and the inference that Hilton was not struck with the hammer is much stronger than that he was struck with it. Hilton had the hammer when he received the first blow, and the appellant had it after the last blow had been struck. It is not only clear that the wounds could have been made with a blow from the clenched fist, but the evidence is convincing that they were made in this way. There is no evidence of more than one wound on the jaw. This wound, if we accept the testimony of the boy and Hilton, was made with the fist. If the appellant could inflict this wound by a blow with the fist, and if the blow was so severe that Hilton was thereafter unconscious, it is evident that the other and less serious wounds were made in the same way. The appellant's explanation, which we have quoted, is only explanatory of his motive in making the assault.

There is abundant evidence to support the verdict of the jury upon the question of the assault. The assault was unprovoked and aggravated. The crime of assault is embraced in the information. The liberty of the citizen is too sacred to be taken away on inference alone, when such inference

points more strongly to innocence than to guilt. While courts are reluctant to interfere with the solemn conclusion of the jury, yet their duty to do so in proper cases is clearly recognized by law. We cannot escape the conviction that the evidence to support the guilt of the defendant is too wanting in substance to support the verdict on the higher offense charged. A considerate regard for the rights of the appellant, therefore, demands that we hold the evidence insufficient to support the verdict for the higher of the two offenses.

Under the rule announced in *State v. Freidrich*, 4 Wash. 204, 29 Pac. 1055, 30 Pac. 328, 31 Pac. 332, the verdict of the jury will stand as to the crime of assault, and the case will be remanded to the superior court of Yakima county, with directions to enter a new judgment for assault, and to proceed thereon according to law.

RUDKIN, C. J., CHADWICK, and PARKER, JJ., concur.

CROW, J., concurs in the result.